# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

LAWRENCE L. WERTS, JR.,

                           Plaintiff,

     v.                               5:13-CV-914
                                          (LEK/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                           Defendant.

---

HOWARD D. OLINSKY, ESQ., for Plaintiff
AMANDA LOCKSHIN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Lawrence E. Kahn, Senior, United States District Judge, pursuant to 28 U.S.C. § 636 (b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On November 16, 2010, plaintiff protectively[1] filed for Supplemental Security Income ("SSI") Benefits, alleging disability beginning June 4, 1988.[2] (Administrative

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

[2] Plaintiff is claiming disability based on mental retardation and a learning disability. He has suffered from these impairments since his birth date of June 4, 1988. Thus, he has listed an onset date of June 4, 1988. Notwithstanding the onset date, SSI benefits are not payable prior to the month

Transcript ("T.") 63, 203-208). Plaintiff's claims were denied initially on February 23, 2011. (T. 64-67). Plaintiff requested a hearing, which was originally scheduled to be held by video conference on March 13, 2012. (T. 166). However, plaintiff objected to a video conference (T. 165), and his hearing was held in-person on July 16, 2012 before Administrative Law Judge ("ALJ") John P. Ramos. (T. 27-61). ALJ Ramos issued a decision denying benefits on August 6, 2012, (T. 9-26), which became the final decision of the Commissioner when the Appeals Council ("AC") denied plaintiff's request for review on July 11, 2013. (T. 1-6).

## II.  ISSUES IN CONTENTION

Plaintiff makes the following claims:

(1)     The ALJ improperly determined that plaintiff's impairment did not meet Listing 12.05(C). (Pl.'s Br. at 12-14) (Dkt. No. 10).

(2)     The ALJ's residual functional capacity ("RFC") determination is not supported by substantial evidence. (Pl.'s Br. at 14-18).

(3)     The ALJ's credibility determination is not supported by substantial evidence. (Pl.'s Br. at 19-21).

(4)     The ALJ improperly failed to consult a vocational expert. (Pl.'s Br. at 21-23).

Defendant argues that the Commissioner's decision is supported by substantial evidence. (Def.'s Br.) (Dkt. No. 13). As discussed below, this court agrees with the defendant and will recommend dismissal of the complaint.

---

following the month in which the application is filed. 20 C.F.R. § 416.335. In this case, the application was protectively filed on November 16, 2010, resulting in a limit for the payment of SSI benefits of December 16, 2010. The ALJ cited section 410.335, but stated that he had still considered the plaintiff's "complete medical history consistent with 20 C.F.R. § 416.912(d)."

## III. **APPLICABLE LAW**

### A. **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to

perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## IV.   FACTS

The plaintiff has included a statement of facts in his brief. (Pl.'s Br. at 4-10). Defendant has incorporated the summary of the medical evidence as contained in the ALJ's decision. (Def.'s Br. at 3-4). Rather than detailing the evidence in this case at the outset, the court will adopt the facts as stated by the plaintiff and the ALJ, with any exceptions noted, as necessary to address the issues raised by plaintiff.

## V.   ALJ's DECISION

The ALJ found that plaintiff has not engaged in substantial gainful activity since he filed his application, based upon a consideration of the plaintiff's testimony and

wage information, together with the evidence as a whole. (T. 14). At step two of the

sequential analysis, the ALJ found that plaintiff's mental retardation qualifies as a

severe impairment, but that there was insufficient evidence to establish that plaintiff's

alleged "drug abuse" constituted a "medically determinable impairment."[3] (T. 14-15).

The ALJ also found that plaintiff's asthma was not a "severe" impairment. (T. 15).

At step three of the sequential analysis, the ALJ found that plaintiff's mental

retardation did not meet the severity of a Listed Impairment under 12.05 of the Listings

(20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05). (T. 15-18). In making this

determination, the ALJ reviewed each of the sections contained in Listing 12.05, noting

that "the required level of severity for this disorder is met when the requirements in

paragraphs A, B, C, or D are satisfied." (T. 15). The ALJ analyzed the requirements in

each section and stated the reasons why plaintiff's impairment did not meet those

requirements. (T. 16-18). He found that plaintiff did not meet section C[4] because

although he had a full scale IQ of 69, he did not have "a physical or other mental

impairment imposing an additional and significant work-related limitation of

---

[3] The ALJ noted that in 2010, the plaintiff reported in a "vocational evaluation," that he smoked marijuana regularly, and because of that, vocational assistance was terminated." (T. 15). However, the ALJ then stated that plaintiff denied drug use at both consultative examinations, and he denied drug use when he established care with his new treating physician. (*Id.*) Although plaintiff testified at his hearing, that he occasionally smoked marijuana, the ALJ found that there were no medical signs or laboratory findings which substantiated the existence of a medically determinable impairment. (*Id.*) Therefore, the ALJ did not further consider "drug addiction" in the decision. Plaintiff does not contest this finding, and this court agrees that the ALJ's determination at step two is supported by substantial evidence.

[4] Plaintiff does not allege, nor is there any issue, that he meets the requirements of sections A or B. Thus, this court will confine its discussion to section C of Listing 12.05. The court will discuss section D to the extent that the limitations listed therein are relevant to any RFC determination.

function."[5] (T. 16).

In making the Listing 12.05(C) determination, the ALJ considered plaintiff's asthma as another "physical" impairment and found that plaintiff only had a problem with his asthma when the weather was hot and when he played basketball.  A July 2012 physical examination did not reveal any wheezing.  Plaintiff had clear lungs, good airflow, and there was no evidence of pulmonary function testing or frequent hospitalizations due to chronic asthma. (T. 16).  Thus, plaintiff's asthma would not impose the required "additional and significant" work-related limitation of function to support a finding under Listing 12.05(C).

With respect to any additional "mental" impairment, the ALJ found that there was no evidence that plaintiff's level of adaptive functioning was more than mildly limited.  The ALJ explained that adaptive functioning included, but was not limited to, communication, self-care, home-living, social, "community use," health and safety, academics, leisure, and work. (*Id.*)  The ALJ also noted that although plaintiff had worked in the past, at "non-substantial gainful activity levels," this activity indicated "levels of adaptive functioning including the ability to maintain a schedule and work with others consistent with the ability to perform unskilled entry-level work." (T. 17). The ALJ relied upon consultative psychologists, Dr. Kirsten Barry, PhD and Dr. Dennis M. NAIA, PhD, together with plaintiff's testimony regarding the extent of his activities. (T. 16-17).

---

[5] Section C requires that the individual have ***both*** a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(c).

7

In considering whether plaintiff met Listing 12.05(D), although the ALJ found that plaintiff met the IQ requirement, plaintiff did not have the required "marked restriction" in two of the listed areas of functioning: activities of daily living, social functioning, maintaining concentration, persistence, or pace, or repeated episodes of decompensation. (T. 17). The ALJ undertook a detailed analysis of each area. (T. 17-18). The ALJ also noted that the paragraph D limitations were for purposes of the steps two and three analysis, and that the RFC assessment at steps four and five would require a further evaluation of these categories. (T. 18).

At step four of the sequential analysis, the ALJ found that plaintiff retained the physical RFC to perform work at all exertional levels. (T. 18). In addition, plaintiff retained the ability to understand and follow simple instructions and directions, perform simple tasks with supervision and independently, maintain attention and concentration, for simple tasks, regularly attend to a routine and maintain a schedule, relate to and interact appropriately with others to the extent necessary to carry out simple tasks, and handle reasonable levels of simple, repetitive work-related stress. (*Id.*) The ALJ found that plaintiff could make decisions related to the performance of simple tasks in a job with duties that did not require the plaintiff to supervise or manage the work of others. (*Id.*)

The ALJ gave the evaluations of Dr. Barry and Dr. NAIA the "greatest weight," due to their professional and program expertise, because their evaluations were consistent with the plaintiff's reported activities, and because their opinions were rendered after examining the plaintiff. (T. 20). The ALJ gave less weight to the State

Agency psychologist because he never had the opportunity to examine plaintiff, and he gave "little weight" to the very restrictive mental RFC authored by Anne Barash, M.D. because she did not have a treating relationship with plaintiff, having made her assessment after a "one-time" examination in an area that was outside of her expertise.[6] Finally, the ALJ gave "little weight" to the opinion written by Wendy Leonard because it was "unclear what [her] professional field of expertise [was]," and she did not have the credentials to qualify as an acceptable medical source under the regulations. (T. 20). Additionally, the ALJ found that Dr. Barry's and Dr. NAIA's opinions were "more reliable." (*Id.*)

The ALJ found that, to the extent that plaintiff and his mother testified to greater restrictions, their testimony was not credible. (T. 19). This determination was based upon plaintiff's own testimony regarding his daily activities, his statements to Dr. NAIA, and the inconsistency of plaintiff's mother's statements, compared to the observations of the medical professionals. (*Id.*)

The ALJ found that plaintiff had no past relevant work,[7] but that based upon his age, education, work experience, and RFC, there were jobs in the national economy that he could perform. (T. 20). The ALJ found that although his ability to work has been compromised by his non-exertional limitations, those limitations had "little or no effect on the occupational base of unskilled work at all exertional levels." (T. 21). The ALJ

---

[6] Dr. Barash appears to be a family practitioner. (T. 365-67).

[7] Plaintiff performed work in the past, including volunteer work and some other maintenance-type work, but not at substantial gainful activity levels. Thus, plaintiff's prior work activity did not qualify as "past relevant work" under the regulations. 20 C.F.R. § 416.960(b)(1).

found that notwithstanding plaintiff's mental limitations, he was able to "meet the basic

demands of competitive, remunerative, unskilled work . . . ." (*Id.*)

## DISCUSSION

## VI. Listing Analysis

### A. Legal Standard

The plaintiff argues that the ALJ erred in his listings analysis by finding that

plaintiff did not meet the requirements of Listing 12.05(C) for mental retardation.

Listing 12.05 states in pertinent part:

> Mental retardation refers to significantly subaverage general intellectual
> functioning with deficits in adaptive functioning initially manifested during the
> developmental period; *i.e.*, the evidence demonstrates or supports onset of the
> impairment before age 22.

> The required level of severity for this disorder is met when the requirements of
> A, B, C, or D are satisfied.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. To meet Listing 12.05, a claimant must

satisfy the diagnostic description in the quoted introductory paragraph, in addition to

the criteria in any one of the four subparagraphs that follow. *Douglass v. Astrue*, No.

11–3325–cv, 2012 WL 4094881, at *3 (2d Cir. Sept. 19, 2012); 20 C.F.R. Pt. 404,

Subpt. P, App. 1, 12.00(A) ("If your impairment satisfied the diagnostic description in

the introductory paragraph and any one of the four sets of criteria, we will find that

your impairment meets [Listing 12.05]."). The additional criteria for subsection

12.05(C) are:

> A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or
> other mental impairment imposing an additional and significant work-related

limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).[8]

## B.    Application

In this case, it is undisputed that plaintiff meets the first part of section 12.05(C). In his most recent IQ test, administered by Dr. Barry in 2006,[9] plaintiff's full-scale IQ was 69.[10]  Plaintiff argues that he also meets the second part of this listing because, in addition to his Full Scale IQ of 69, he suffers from a "learning disability: a speech/language impairment," which imposes an additional and significant work-related limitation of function.[11] (Pl.'s Br. at 13).  Counsel cites a report, dated December

_____

[8] The court notes that the ALJ extensively discussed all the sections of Listing 12.05. (T. 15-18).  To establish that a claimant meets the requirements of Listing 12.05(C) for mental retardation, as opposed to the listings for other mental disorders, it is **not** necessary to prove that he or she satisfies the "paragraph B" criteria of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C), by establishing at least two of the following: **marked** restrictions in activities of daily living; **marked** difficulties in maintaining social functioning; **marked** difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  *See Douglass v. Astrue*, 2012 WL 4094881, at *2-3 (Listing 12.05 has a structure that is different from that of the other mental disorders listings); *Mendez v. Astrue*, 11–CV–276S, 2012 WL 3095587, at *4 (W.D.N.Y. July 30, 2012) (the analysis of whether a claimant has "marked restrictions" in daily living, social functioning, and concentration "is not necessarily transferable to the introductory paragraph of § 12.05, which does not require 'marked restrictions' but simply 'deficits in adaptive functioning.'").  These broad functional areas were considered when the ALJ analyzed whether plaintiff met the Listings under section 12.05(D) and later, when the ALJ considered plaintiff's RFC at step four.  The ALJ found that plaintiff only had "mild" restrictions in daily living and social functioning, "moderate" restrictions in concentration, persistence, and pace, and had no episodes of decompensation. (T. 17-18).

[9] Dr. Barry, a consultative psychologist, examined plaintiff in conjunction with a prior unsuccessful application for SSI benefits. (T. 14).

[10] Plaintiff's Verbal Scale IQ was 70, and his Performance Scale IQ was 74. (T. 363).

[11] Although plaintiff has been diagnosed at various times with asthma, he is not claiming that his asthma qualifies as an additional impairment under Listing 12.05.  In any event, the ALJ specifically rejected any such claim in his decision. (T. 16).  The ALJ correctly found that plaintiff testified that his asthma only bothers him in hot weather and when he plays basketball. (*Id.*)  The ALJ

6, 2005, authored by Henniger High School Psychologist Randi Wheeler. (T. 306-308). This report states that plaintiff is mentally retarded "and also receives speech/language services." (T. 306). There is no specific diagnosis of a "learning disability" in this report.

The report states that plaintiff liked school, some of his teachers, and most of the other students. (T. 308). The report also states that plaintiff reported paying attention,[12] asking for help when needed, participating, doing class and homework. (T. 308). He had a "positive" relationship with his family members, works every day after school, enjoys playing basketball, talking on the phone, playing video games, and watching television. He had no trouble sleeping and took no medications. (*Id.*)

In the report summary, Mr. Wheeler stated that even though many of plaintiff's skills were in the "deficient" range, "he seem[ed] to perform better when he [was] able to use his reasoning skills to solve problems." (T. 308). His ability to answer reading comprehension questions [was] better developed that his decoding skills," and "his ability to answer word problems [was] better developed than his ability to compute straight forward math, and his writing skills [were] better developed than his spelling skills." Mr. Wheeler stated that plaintiff had shown some "gradual growth in some areas since last tested." (*Id.*) Mr. Wheeler concluded that because of plaintiff's

---

also found that a 2012 examination of plaintiff's lungs showed that they were "clear" with regular respirations, no wheezing, and good air flow. There was no evidence of any pulmonary function testing or frequent hospitalizations due to the asthma. Thus, the only issue is whether plaintiff has an additional "mental" impairment for purposes of Listing 12.05.

[12] He stated that he was able to "pay attention sometimes." (T. 108).

cognitive and achievement test scores, it was recommended that he continue to be designated at Mentally Retarded, but there was no "diagnosis" of a "learning disability," separate from the mental retardation.

Plaintiff also argues that Wendy Leonard's report, dated September 30, 2010, supports a finding that plaintiff has an additional mental impairment that significantly limits his abilities. (Pl.'s Br. at 13) (citing T. 241-42)). Ms. Leonard, who plaintiff states is a vocational rehabilitation counselor,[13] completed a "Vocational Intake Report" for VESID.[14] In a section entitled "Impairment," she noted a "Primary Impairment" of "a cognitive impairment(s) due to mental retardation and a "Secondary Impairment" of "a cognitive impairment(s) due to a specific learning disability." (T. 241).

Although Ms. Leonard mentions a "specific learning impairment," there is no indication what that impairment might be and how it would be separate from the mental retardation, or how it would cause more limitations than those caused by plaintiff's mental retardation.[15] Plaintiff's counsel states that the learning disability to which Ms.

---

[13] In the record, there is no indication what Ms. Leonard's qualifications might be, and the ALJ commented on this lack of information in his step four analysis. (T. 20). Plaintiff's brief states that Ms. Leonard is a vocational rehabilitation counselor. (Pl.'s Br. at 13). The Adult Career and Continuing Education Services-Vocational Rehabilitation website lists Ms. Leonard as a "VR Couselor." www.acces.nysed.gov/vr/syracuse/contact.htm. This court will therefore assume that Ms. Leonard is a vocational rehabilitation counselor. However, as discussed herein, this position does not qualify her as an acceptable medical source under 20 C.F.R. § 416.913 in any event.

[14] "VESID" stands for Vocational and Educational Services for Individuals with Disabilities. http://www.fcny.org/train/trainhtml/geninfo.htm.

[15] The court also notes that, even though her report is dated September 30, 2010, Ms. Leonard states that she reviewed only plaintiff's school records from 2005, which included IQ tests from 2000. (T. 241). The plaintiff's tests from 2000 contained lower IQ scores than those reflected in his updated testing, which was conducted by Dr. Barry in 2006. (T. 241, 362). The court notes that 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(D)(10) limits the validity of IQ test results obtained between the ages of

Leonard refers is a "speech/language impairment." (Pl.'s. Br. at 13). In Ms. Leonard's report, she indicated that plaintiff "struggled with communication," and had problems with "distracting" speech. (T. 241). Ms. Leonard also stated that plaintiff struggles with receptive language and expressive communication. (T. 242). Plaintiff argues that this problem results in difficulty following multiple directions, following written instructions, learning new tasks, and understanding complex sentences or language subtleties. (Pl.'s Br. at 13) (citing T. 242).

It has been held that "a limitation other than low IQ is 'significant' if the claimant suffers from an additional physical or other mental impairment that is 'severe' as that term is defined at step two of the Commissioner's sequential analysis." *Edwards v. Astrue,* No. 5:07-CV-898, 2010 WL 3701776, at *6 (N.D.N.Y. Sept. 16, 2010). The ALJ noted that there was no evidence that the plaintiff's level of current adaptive functioning was more than mildly limited, citing communication, self-care, home living, social, community use, self-direction, health and safety, leisure, and work.[16]

---

seven and sixteen to two years when the score is 40 or above. *See Colon-Torres v. Colvin,* No. 6:12-CV-1591, 2014 WL 296845, at *2 (N.D.N.Y. Jan. 27, 2014) (citation omitted). In 2000, this plaintiff was 11 years old, and the tests resulted in scores above 40 (a verbal IQ of 59, performance IQ of 69, and a full scale IQ of 61). (*See* T. 241, 325). Thus, although neither party mentions this fact, Ms. Leonard was considering IQ scores that were no longer valid pursuant to the regulations. This rule does not apply to the IQ scores from 2006. The 2006 tests were administered on August 1, 2006, when plaintiff was 18, resulting in a verbal IQ of 70, a performance scale IQ of 74, and a full scale IQ of 69. (T. 361, 363).

[16] Plaintiff argues that he meets Listing 12.05, based upon his deficits in adaptive functioning, which he refers to as the "adaptive functioning requirement." (Pl.'s Br. at 13). Among other cases, counsel cites *Edwards v. Astrue,* No. 5:07-CV-898, 2010 WL 3701776, at *2-3. Plaintiff argues that from an early age, his "adaptive skills" have been found to be in the deficient range, he was enrolled in special classes, dropped out of school, and had difficulties in reading and math skills. (Pl.'s Br. at 13-14). The court notes that the introductory section of Listing 12.05 states that "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning

14

In 2006, Dr. Kirsten Barry, an acceptable medical source,[17] stated under "AXIS I"[18] that plaintiff has a "Learning Disorder, NOS," apart from his mental retardation. (T. 363). However, her narrative findings did not reflect a "significant limitation" in plaintiff's ability to function due to the additional disorder. Dr. Barry found that plaintiff's speech and language skills were "adequate. (T. 362). He was "relaxed and

---

initially manifested during the developmental period: *i.e.* the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. § 12.05 (Introductory Paragraph). "The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied." *Id.* The deficits in adaptive functioning that must be manifested *before age 22* are in the definition of mental retardation. The discussion in *Edwards* relates to the determination of whether plaintiff was mentally retarded and whether the court could "infer deficits in adaptive functioning prior to age 22" by considering whether the plaintiff attended special education classes, or had difficulties in reading writing or math. In *Edwards*, the plaintiff had never been diagnosed with mental retardation. 2014 WL 3701776, at *3. This plaintiff has been diagnosed with mental retardation. Thus, his deficits in adaptive functioning *prior to age 22* are no longer the issue.

[17] Acceptable medical sources are individuals who may "establish" an impairment according to the regulations. 20 C.F.R. § 416.913(a). The regulations also list "other" sources, who, while not acceptable for purposes of establishing an impairment, may be considered to show how the impairment may affect the claimant's ability to function. *Id.* § 416.913(d). A rehabilitation counselor, while not an acceptable medical source, must be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file. *Colon v. Astrue*, No. 11-CV-201(A), 2013 WL 2245457, at *10 (W.D.N.Y. May 21, 2013) (citations omitted). *See also* Social Security Ruling ("SSR") 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("other sources" include rehabilitation counselors). "Information from these 'other sources' cannot establish the existence of a medically determinable impairment. . . . [I]nformation from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.*

[18] Mental impairments are included on a multiaxial system of assessment, consisting of five axes, each of which refers to a different domain of information. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS- IV (Text Revision) ("DSM-IV-TR") at 27. Clinical disorders and "Other Conditions That May Be a Focus of Clinical Attention" are listed under AXIS-I. *Id.* "Personality Disorders" and "Mental Retardation" are listed under AXIS-II. "General Medical Conditions" are listed under AXIS-III, "Psychosocial and Environmental Problems" are listed under AXIS-IV, and the "Global Assessment of Functioning" score is listed under AXIS-V. *Id.* The DSM-IV-TR states that the multiaxial system provides a "convenient format for organizing and communicating clinical information . . . ." *Id.*

comfortable throughout the testing session." (T. 362). Dr. Barry stated that plaintiff was able to recall, understand, and follow simple directions and instructions, and was able to perform simple tasks independently. (T. 362, 363). Plaintiff worked in a "deliberate and orderly fashion on tasks," with fair attention and concentration. Plaintiff did not evidence any significant emotional stress during the evaluation. (T. 362). Dr. Barry noted that plaintiff was "actually working . . . doing some painting." (T. 363). She stated that plaintiff demonstrated "cognitive delays," and might have "difficulty" with "some complex tasks independently, but demonstrates the ability to learn new tasks." Plaintiff "may at times" have difficulty dealing with stress, but appeared to relate adequately with others. (T. 363).

In 2011, Dr. NAIA had "No diagnosis" listed under "AXIS I," and did not diagnose any other mental or physical impairment aside from "R/O Mild Mental Retardation" under "AXIS II." (T. 337). Contrary to Ms. Leonard's opinion, Dr. NAIA found that plaintiff's speech and intelligibility were "fluent," the quality of his voice was clear, and his expressive and receptive language was "moderately adequate." (T. 335). Dr. NAIA also stated that plaintiff's demeanor and responsiveness to questions was "cooperative," his manner of relating, social skills, and overall presentation were "moderately adequate." (T. 335). Plaintiff's thought processes were coherent and goal directed. (*Id.*)

In his "Medical Source Statement," Dr. NAIA stated that plaintiff appears to be capable of understanding and following simple instructions, performing simple tasks independently and under supervision, and capable of maintaining attention and

concentration for those tasks. (T. 336). Dr. NAIA also found that plaintiff would be capable of learning "simple" new tasks and appeared capable of making "simple" appropriate decisions. He was capable of relating moderately well with others and "appears capable of dealing with stress." Dr. NAIA stated that the results of the examination suggested "no significant psychiatric problems." (*Id.*)

It is the province of the ALJ to consider and resolve conflicts in the evidence as long as the decision rests upon "adequate findings supported by evidence having rational probative force." *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (citing *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002)). In this case, the ALJ properly considered, but discounted Ms. Leonard's report in favor of the reports authored by doctors Barry and NAIA, who are both acceptable medical sources, who considered updated intelligence tests, and whose reports were consistent with each other.

To the extent that plaintiff claims he has an additional "learning disability" in the form of a "speech/language impairment,"[19] even assuming the existence of such an impairment, the reports written by Dr. NAIA and Dr. Barry support the ALJ's finding that plaintiff's speech and language difficulties do not add the significant limitations necessary to meet the listing. The ALJ clearly analyzed the opinions of record in supporting his finding that plaintiff did not meet the criteria for Listing 12.05. Thus, the ALJ's decision that plaintiff did not suffer from a Listed Impairment is supported by

---

[19] The court notes that there does not appear to be any diagnosis of a "speech/language impairment" by a "qualified speech/language pathologist," listed as an acceptable medical source under 20 C.F.R. § 416.913(a)(5).

substantial evidence.

## VII.  **Residual Functional Capacity ("RFC")**

### 1.  **Legal Standard**

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

The Commissioner has issued a ruling discussing the determination of RFC in individuals with solely nonexertional impairments, using the Medical Vocational Guidelines as a framework. *Do Other Work - The Medical Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments*, SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985).  The Ruling provides that the "basic mental demands of

competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and unusual work situations; and to deal with changes in a routine work setting." *Id.*

## B. Application

The ALJ found that plaintiff retained the ability to work at all *physical* levels. (T. 18). Plaintiff does not contest this finding. The ALJ also found that plaintiff retained the abilities listed above which would allow him to perform the "basic mental demands" of work. (*Id.*) The ALJ found that plaintiff could understand and follow simple instructions and perform "simple" tasks, both independently and with supervision. The ALJ found that plaintiff could maintain attention and concentration for simple tasks, regularly attend to a routine and maintain a schedule. He was able to interact appropriately with others to the extent necessary to carry out simple tasks, and could handle "reasonable levels" of work-related stress, making decisions related to the performance of simple tasks in a position with "consistent duties" which do not require the plaintiff to supervise or manage others. (*Id.*)

Plaintiff argues that in making this decision, the ALJ erred in affording "little" weight to the opinion of Anne Barash, M.D. (Pl.'s Br. at 14-17). Plaintiff argues that Dr. Barash is plaintiff's treating physician, and her opinion should have been given greater weight. Plaintiff also argues that the ALJ erred in failing to "consider" Ms. Leonard's opinion. (*Id.*)

A treating physician's opinion is not binding on the Commissioner, and the

opinion must be only given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected.  *Id.*  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

The regulations provide that when controlling weight is not given to the "treating source's" opinion, the Commissioner considers various factors in determining what weight to give the opinion. 20 C.F.R. § 416.927(c)(2)(I) & (ii).  These factors include: the length of the treatment relationship, the nature and extent of the treatment relationship, the "supportability" of the opinion, the consistency of the opinion in relation to the record as a whole, the source's specialization, and any other factors which are brought to the Commissioner's attention. *Id.*

Dr. Anne Barash is a Family Care physician, who submitted a medical report, dated July 19, 2012, together with a "Medical Source Statement," dated July 17, 2012. (T. 365-71).  The only other record authored by Dr. Barash is a letter, dated July 19, 2012, requesting that plaintiff be excused from jury duty based upon his lack of cognitive function "to make informed decisions" regarding the lives of others. (T. 368). Although Dr. Barash appears to have a Masters Degree in Social Work as well as an MD, at the time she wrote her reports, she had only examined the plaintiff once or

twice.  In her general medical report, dated July 19, 2012, Dr. Barash stated that plaintiff "presents for general physical exam in order to apply for disability." (T. 365). Her Medical Source Statement consists of checked boxes on a grid, indicating plaintiff's limitations. (T. 369-71).

The ALJ gave Dr. Barash's evaluation little weight because she had not established a treating relationship with plaintiff at the time of her evaluation and her opinion appeared to be based upon an area outside of her expertise. (T. 20).  Thus, she was not a "treating physician," whose opinion was entitled to greater weight.  The ALJ's finding is supported by the evidence of record.  There are no reports from Dr. Barash prior to July 17 or 19th of 2012, although the Medical Source Statement states that her first visit with "this patient" was June 27, 2012. (T. 369).  Thus, Dr. Barash does not have a "longitudinal" picture of the plaintiff's condition, even though plaintiff argues that the few times that Dr. Barash saw plaintiff established a "treating" relationship.

The ALJ noted that Dr. Barash's opinion appeared to be "beyond her expertise." A medical source's "specialty" is specifically listed as one of the proper considerations in determining the weight to be given to the medical reports. 20 C.F.R. § 416.927(c)(5). Plaintiff argues that Dr. Barash's "treating relationship" is "at least more extensive than a single visit focused only upon a disability evaluation.[20]  Plaintiff also states that "there is nothing in the record regarding Dr. Barash's area of expertise, and the ALJ did not

---

[20] The court notes that Dr. Barash begins her physical examination report by stating that plaintiff presents for a "general" physical exam "in order to apply for disability benefits." (T. 365). Thus, the focus of Dr. Barash's examination on July 19th was also plaintiff's disability benefits.

21

note what assessment, if any, is outside of her area of expertise." (Pl.'s Br. at 16).

While it is true that Dr. Barash may have examined plaintiff more than once when she submitted her report, at most, she had seen him two or three times. This is hardly an extensive treating relationship.[21] Dr. Barash appears to be a family physician, while Dr. NAIA and Dr. Barry are both psychologists, even though they only examined plaintiff once. The only issue in this case is plaintiff's mental condition, therefore, the ALJ's comment about Dr. Barash's area of expertise is directed at her apparent lack of psychological qualifications.[22]

The court also notes that Dr. Barash's medical source statement is inconsistent with Dr. Barry's and Dr. NAIA's statements and with plaintiff's testimony at the hearing. In her medical source statement, Dr. Barash checked boxes, stating that plaintiff had a "blunt, flat, or inappropriate" affect; has "[p]overty of content of speech;" difficulty thinking or concentrating; impairment in impulse control; illogical thinking; and is easily distracted. (T. 369). Dr. Barash also stated that plaintiff was seriously limited, but not precluded in his ability to carry out very short and simple instructions, but was "unable" to meet competitive standards in understanding and remembering very short and simple instructions. (T. 370). Dr. Barash stated that plaintiff was unable to meet competitive standards in asking simple questions or requesting assistance and had "no useful ability to function" in accepting instructions

---

[21] At the July 16, 2012 hearing, plaintiff's counsel stated that plaintiff had started treating with Dr. Barash "about a month and a half ago." (T. 30).

[22] The court notes that the fact that Dr. Barash appears to have a masters degree in social work does not establish an expertise in psychology. (*See* T. 368) ("Anne Barash, MSW, MD").

and responding appropriately to criticism from supervisors. (*Id.*)

However, Dr. NAIA stated that plaintiff's demeanor and responsiveness to questions was cooperative, and his manner of relating, social skills, and overall presentation was moderately adequate. (T. 335). Plaintiff's speech intelligibility was "fluent," and the quality of his voice was clear. His expressive and receptive language was moderately adequate. His thought processes were "coherent and goal directed with "no evidence of delusions, hallucinations, or disordered thinking." (*Id.*) His affect was "congruent with [his] thoughts and speech." (T. 336). His attention and concentration as well as his recent and remote memory, were "intact." (*Id.*) Dr. NAIA's medical source statement indicates that plaintiff can perform the basic mental requirements of competitive, remunerative work, cited in the regulations. The conflicts in evidence between Dr. NAIA's and Dr. Barry's opinions and Dr. Barash's opinion are for the Commissioner to resolve. The ALJ was entitled to find that Dr. NAIA and Dr. Barry's psychological opinions were "more reliable" than a family practitioner's estimation of plaintiff's mental status.

Plaintiff also argues that the ALJ improperly failed to discuss Dr. Barry's finding that plaintiff would have "difficulty dealing with stress," and contained "no determination regarding stress," even though he gave Dr. Barry's report great weight. (Pl.'s Br. at 18). First, as stated above, the ALJ is not required to reconcile every shred of evidence in his opinion. *See Schneider v. Colvin*, No. 3:13-CV-790, 2014 WL 4269083, at *2 (D. Conn. Aug. 29, 2014) (citing *Miles v. Harris*, 645 F.2d at 124); *Lockwood v. Colvin*, No. 12-CV-973, 2014 WL 3894494, at *9 (W.D.N.Y. Aug. 8,

2014) (citing *Miles, supra*). The court also notes that when discussing the medical opinions, the ALJ **did** mention stress when he stated that "[t]he claimant may at times have difficulty dealing with stress because of cognitive limitations." (T. 19). In fact Dr. Barry's entire sentence reads: "He denies any psychiatric symptomatology and may at times have difficulty dealing with stress because of his cognitive limitations, **but** appears able to relate adequately with others."[23] (T. 363) (emphasis added). Clearly, the ALJ considered Dr. Barry's finding regarding stress. Additionally, the fact that plaintiff might have difficulty in dealing with stress does not indicate that he would be incapable of dealing with stress, given Dr. NAIA's statement that "he appears to be capable of dealing with stress." (T. 336).

Plaintiff told Dr. NAIA that he "is able to work at the present time, but cannot find work." (T. 334). Plaintiff also testified that if he failed to "get the point," he got frustrated, but that "I'll just like to ask for help, because they say it [sic] always good to ask for help." (T. 43). Plaintiff was also asked whether he had any problems getting along with co-workers, and said: "Oh, no." (*Id.*) He testified that he got along with all of his teachers except one, but that his health teacher was "real cool." (T. 44). Plaintiff testified that he liked to draw, play video games, hang out with the girls, go to the movies, enjoy himself, and "stay away from drama and trouble." (T. 42). Plaintiff was asked if he had problems understanding the bus schedule, and said, "no" because "I just

---

[23] Contrary to Dr. Barash's finding that plaintiff would be unable to meet competitive standards in recalling and understanding simple instructions, Dr. Barry found that plaintiff was "able to recall and understand the instructions and did work in a deliberate and orderly fashion on tasks." (T. 362, 370). Dr. Barry also stated that plaintiff's attention and concentration were "fair," and he did not evidence any significant emotional distress during the evaluation. (T. 362)

24

call Central [sic], and they let you know when the bus is coming." (T. 38). Plaintiff testified about skills that he learned when he worked for the City of Syracuse over the summer, cleaning out the houses of people who had moved out. These skills included fixing holes in the wall, putting up sheetrock, painting, and "putting in tile floors." (T. 38-40). Plaintiff testified that he used the computer "a little bit." (T. 33).

Plaintiff also argues that the ALJ failed to consider the opinion of Ms. Leonard in assessing plaintiff's RFC. As stated above, the ALJ was correct in determining that there was insufficient evidence of Ms. Leonard's qualifications in the record as compared to Dr. NAIA and Dr. Barry. It is also clear that Ms. Leonard was considering an outdated IQ test when she made her observations of plaintiff for the VESID interview.[24] Thus, the ALJ's properly weight the record evidence, and his RFC finding was based on substantial evidence.

## VIII. <u>Credibility</u>

### A. **Legal Standard**

"An [ALJ] may properly reject [subjective complaints] after weighing the

---

[24] The court notes that there are some other inconsistencies in Ms. Leonard's report. She stated that plaintiff had "multiple arrests" for stealing cars and over 200 tickets for traffic violations as a youthful offender. (T. 243). Ms. Leonard states that plaintiff was sentenced to 5 years probation and "got off last year." (*Id.*) Dr. Barry's report in 2006 states that plaintiff was "arrested for a stolen car and is currently on probation." (T. 361). In Dr. Noia's 2011 report, he states that plaintiff's legal history was "Age 18, 'taking a car,' 1 day in jail." (T. 335). At the hearing, plaintiff testified that he participated in Meals-On-Wheels because he was "on probation" and had to perform 15 hours of community service." (T. 44). There is no question that when plaintiff was in school, he had issues with skipping classes and testified that sometimes people teased him, but he tried to "stay away from all that." (T. 44). Plaintiff is not claiming that his legal background is an issue, but it appears that Ms. Leonard's statement is slightly at odds with the other evidence of record regarding the number of arrests, and there is no other evidence of "traffic violations."

objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any

measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

## B.    Application

Plaintiff argues that the ALJ's finding that plaintiff and his mother were not completely credible is not supported by substantial evidence. (Pl.'s Br. at 20-21). While the ALJ found that plaintiff had some limitations, he also found that plaintiff's description of his daily activities were "not limited to the extent one would expect given his complaints of disabling symptoms and limitations." (T. 19). The ALJ quite correctly cited all of the testimony that this court has discussed above regarding plaintiff's activities and his ability to work, learn new tasks, and attend to a schedule and a routine. There is no question that he is able to attend to his personal needs. He can use a microwave, and do general cleaning, laundry, and shopping, even though he does not generally use public transportation. (T. 19, 41, 42, 48). He testified that when he was working, he knew how to get his checks cashed, and he paid his cell phone bill. (T. 47-48). He told Dr. NAIA that he could work, but could not find a job. His mother testified that plaintiff has applied for jobs, but no one "wants to hire him." (T. 60).

The ALJ discounted plaintiff's mother's testimony, in part, because the ALJ found that she was an interested witness, she was not in a position to evaluate plaintiff's mental capacities, and because her testimony "like the claimant's, is simply not consistent with the preponderance of the opinions and observations by medical providers in this case." (*Id.*) SSR 06-03p states that in considering evidence from non-

medical sources, such as "spouses, parents, and friends," it is appropriate to consider the nature and extent of the relationship, "whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR-06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006).

While plaintiff may be correct in arguing that the ALJ cannot simply reject plaintiff's mother's testimony because she is inherently biased in his favor, the ALJ in this case rejected the testimony because it was not consistent with the evidence. The Social Security Ruling specifically allows this as a basis for rejection of the testimony. Plaintiff himself testified to a great deal more activities than his mother implied that he could do. He told Dr. NAIA that he could work. He has spent many hours doing volunteer work for Meals-On-Wheels, and he has done work for his uncle and the City of Syracuse during the summer months. His mother also testified that plaintiff worked for a while cleaning apartments, but he stopped working because "the grant ran out," and they "didn't have enough money." (T. 59). She also testified about plaintiff's volunteer work with Meals-On-Wheels. (*Id.*) She stated that plaintiff was even awarded a plaque for his volunteer work. (*Id.*) While these jobs do not rise to the level of prior work experience or substantial gainful activity because plaintiff did not make enough money, his ability to perform the functions associated with these jobs is a proper consideration for the ALJ. Additionally, as stated above, plaintiff himself testified to a wide variety of activities. The ALJ's credibility finding was thus, supported by substantial evidence.

## IX.    Vocational Expert

### A.    Legal Standards

Once the plaintiff shows that he cannot return to her previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[25] are present or when exertional impairments do not fit

---

[25] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Mental impairments are clearly nonexertional.

squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Bapp v. Bowen*, 802 F.2d at 603. Rather, only when a claimant's nonexertional limitations "significantly limit the range of work permitted by his exertional limitations" will sole reliance on the Grids be deemed inappropriate. *Id*. at 605-06. Case-by-case determinations can be difficult when an individual has mental impairments, and in Social Security Ruling (SSR) 85-15, the Social Security Administration has promulgated guidelines and examples that illustrate when a nonexertional limitation will "significantly limit" a claimant's range of work. 1985 WL 56857, at *4.

An ALJ may determine whether a plaintiff's mental impairments "significantly diminish" his or her work capacity by determining whether the plaintiff can meet the basic mental demands of competitive, remunerative, and unskilled work as stated the SSR-15. The ruling states that these basic demands include the ability, on a sustained basis, to "understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Id.* A substantial loss of the ability to meet any of these demands would severely limit the potential occupational base at any exertional

level and would, thus, "significantly diminish" the plaintiff's work capacity. *See Sipe v. Astrue*, No. 5:09-CV-1353, 2012 WL 2571268, at *8 (N.D.N.Y. July 3, 2012). This would prohibit the use of the Grids and necessitate the use of a VE to determine whether there would be any jobs left in the national economy that the plaintiff could perform.

### B. Application

In this case, the ALJ found that, while plaintiff had some mental limitations, he was otherwise able to meet the basic demands of competitive, remunerative, unskilled work; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting. (T. 21). The ALJ held that these limitations "have little or no effect on the occupational base of unskilled work at all exertional levels." (*Id.*) Relying on an interpretation of the Dictionary of Occupational Titles, plaintiff argues that the ALJ should have called for the testimony of a VE because plaintiff's ability to perform only "simple tasks," follow "simple instructions," maintain attention and concentration for simple tasks, and relate to and interact appropriately with others to the extent necessary to perform those simple tasks, significantly limits the amount of work that plaintiff is able to perform. (Pl.'s Br. at 22).

The Second Circuit has found, however, that if the ALJ properly finds that plaintiff's mental condition does not limit his ability to perform "unskilled work, the non-exertional limitations did not result in an additional loss of work capacity sufficient to require the testimony of a VE. *See Woodmancy v. Colvin*, __ F. App'x __, 2014 WL

4290397, at *2-3 (2d Cir. Sept. 2, 2014) (finding that although plaintiff's depression was "severe," a VE was not necessary because the ALJ properly found that plaintiff retained the ability on a sustained basis to "understand, carry out, and remember simple instructions[,] respond appropriately to supervision, coworkers, and usual work situations and to deal with changes in a routine work setting.") (citing *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)); *Lawler v. Astrue*, 512 F. App'x 108, 111-12 (2d Cir. 2013) (no vocational expert necessary when ALJ properly found that plaintiff could perform "basic work activities," notwithstanding some sources opining that plaintiff had "moderate difficulties" in concentration and dealing with others).

Because this court has found that the ALJ's RFC determination is supported by substantial evidence, and the ALJ properly found that plaintiff retained the ability to perform the "basic" work activities cited above, there was no need to call for the testimony of a VE at step five of the disability analysis.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d

Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  October 10, 2014

Hon. Andrew T. Baxter
U.S.  Magistrate Judge